**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| HARLEY-DAVIDSON MOTOR COMPANY, INC., | Case No. 24-cv-06658 |
| Plaintiff, | |
| v. | |
| THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A," | |
| Defendants. | |

**COMPLAINT**

Plaintiff Harley-Davidson Motor Company, Inc. ("Harley-Davidson" or "Plaintiff") hereby brings the present action against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants") and alleges as follows:

**I. JURISDICTION AND VENUE**

1. This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, 28 U.S.C. § 1338(a)–(b) and 28 U.S.C. § 1331.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets business activities toward consumers in the United States, including Illinois, through at least the fully interactive, e-commerce stores[1] operating under the seller aliases identified in Schedule A attached hereto (the "Seller Aliases"). Specifically, Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States

---

[1] The e-commerce store URLs are listed on Schedule A hereto under the Online Marketplaces.

consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and/or funds from U.S. bank accounts and, on information and belief, have sold products using infringing and counterfeit versions of Harley-Davidson's federally registered trademarks to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Harley-Davidson substantial injury in the State of Illinois.

## II. INTRODUCTION

3.　　This action has been filed by Harley-Davidson to combat e-commerce store operators who trade upon Harley-Davidson's reputation and goodwill by offering for sale and/or selling unauthorized and unlicensed products, including motorcycle parts, apparel, jewelry, and other goods using infringing and counterfeit versions of Harley-Davidson's federally registered trademarks (the "Counterfeit Harley-Davidson Products"). Defendants create e-commerce stores operating under one or more Seller Aliases that are advertising, offering for sale, and selling Counterfeit Harley-Davidson Products to unknowing consumers. E-commerce stores operating under the Seller Aliases share unique identifiers, establishing a logical relationship between them and that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid and mitigate liability by operating under one or more Seller Aliases to conceal both their identities and the full scope and interworking of their counterfeiting operation. Harley-Davidson is forced to file this action to combat Defendants' counterfeiting of its registered trademarks, as well as to protect unknowing consumers from purchasing Counterfeit Harley-Davidson Products over the Internet. Harley-Davidson has been and continues to be irreparably damaged through consumer confusion,

dilution, and tarnishment of its valuable trademarks as a result of Defendants' actions and seeks injunctive and monetary relief.

## III. THE PARTIES

**Plaintiff Harley-Davidson**

4.     Plaintiff Harley-Davidson Motor Company, Inc. is a Wisconsin corporation having its principal place of business at 3700 West Juneau Avenue, Milwaukee, Wisconsin 53208, and is the owner of the trademark rights asserted in this action.

5.     Harley-Davidson is a world-famous manufacturer of motorcycles and a wide variety of other products and services including apparel, jewelry, leather goods, and assorted accessories.

6.     Since at least as early as 1903, Harley-Davidson has used and promoted the Harley-Davidson name and trademarks in connection with motorcycles, motorcycle parts, and accessories.

7.     Since at least as early as 1910, Harley-Davidson has used its Bar & Shield Logo. The Bar & Shield Logo and variations thereof including, but not limited to, those shown below (collectively, the "Bar & Shield Logo"), are used for motorcycles and related products and services.



8.      Since about 2000, Harley-Davidson has used its Willie G. Skull Logo (or variations thereof) including, but not limited to, those shown below (collectively, the "Willie G. Skull Logo"), for motorcycles and related products and services.



9.      Since about 2008, Harley-Davidson has used its Dark Custom Logo (or variations thereof) including, but not limited to, as shown below (collectively, the "Dark Custom Logo"), for motorcycles and related products and services.



10. Harley-Davidson has continuously sold motorcycles and related goods under HARLEY-DAVIDSON, the Bar & Shield Logo, Willie G. Skull Logo, Dark Custom Logo, and other trademarks (collectively, the "HARLEY-DAVIDSON Trademarks"). As a result of this long-standing use, strong common law trademark rights have amassed in the HARLEY-DAVIDSON Trademarks. Harley-Davidson's use of the marks has also built substantial goodwill in and to the HARLEY-DAVIDSON Trademarks. The HARLEY-DAVIDSON Trademarks are famous marks and valuable assets of Harley-Davidson. Harley-Davidson products typically include at least one of the registered HARLEY-DAVIDSON Trademarks.

11. For generations, the Harley-Davidson brand has been the undisputed world leader in the field of motorcycles and related products, including those which prominently display the famous, internationally recognized, and federally registered HARLEY-DAVIDSON Trademarks (collectively, the "Harley-Davidson Products").

12. Several of the HARLEY-DAVIDSON Trademarks are registered with the United States Patent and Trademark Office, a non-exclusive list of which is included below.

| REGISTRATION NUMBER | REGISTERED TRADEMARK |
|---|---|
| 4,771,447 | |
| 1,621,383 | |
| 1,606,282 | |
| 1,602,474 | |
| 1,450,348 | |
| 1,311,457 | |
| 1,234,404 | |
| 1,219,955 | HARLEY-DAVIDSON |
| 1,078,871 | |
| 508,160 | |
| 507,163 | |
| 3,690,031 | |
| 3,490,890 | |
| 3,393,840 | |

5

| | |
|---|---|
| 1,708,362<br>1,683,455<br>1,406,876<br>1,352,679<br>4,955,539 | HARLEY |
| 1,793,137 | HARLEY OWNERS GROUP |
| 1,654,280<br>2,315,877<br>1,534,449<br>2,042,130 | HD |
| 1,716,992 | HOG |
| 526,750 |  |
| 4,601,391<br>3,559,365<br>3,393,839<br>1,711,882 |  |
| 1,263,936<br>3,185,946 |  |

| | |
|---|---|
| 1,205,380 |  |
| 2,376,674<br>1,741,456<br>1,511,060 |  |
| 1,224,868 |  |
| 3,447,304 |  |

| | |
|---|---|
| 3,697,874<br>3,697,875 |  |
| 3,074,276<br>3,018,481 |  |
| 2,979,002 |  |

| | |
|---|---|
| 2,973,501 |  |
| 4,601,394 |  |
| 3,304,863 |  |

| | |
|---|---|
| 4,844,360<br>4,771,442<br>4,528,269<br>4,465,604<br>4,465,650 |  |
| 5,346,467 | DAYMAKER |
| 1,316,576 | EAGLE IRON |
| 3,818,854 | FAT BOY |
| 5,346,443<br>5,493,726<br>2,530,093<br>5,770,303 | FXRG |
| 2,817,659 | MOTORCLOTHES |
| 3,734,072 | SCREAMIN' EAGLE |
| 1,434,821 | WILLIE G |
| 2,892,609 | <br><br>"Orange Stripe Design"<br>(a wide orange stripe outlined by two narrow stripes) |
| 3,110,597 | STREET BOB |

13.     The above U.S. registrations for the HARLEY-DAVIDSON Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. The registrations for the HARLEY-DAVIDSON Trademarks constitute *prima facie*

10

evidence of their validity and of Harley-Davidson's exclusive right to use the HARLEY-DAVIDSON Trademarks pursuant to 15 U.S.C. § 1057 (b). True and correct copies of the United States Registration Certificates for the above-listed HARLEY-DAVIDSON Trademarks are attached hereto as **Exhibit 1**.

14.     The HARLEY-DAVIDSON Trademarks are distinctive when applied to the Harley-Davidson Products, signifying to the purchaser that the products come from Harley-Davidson and are manufactured to Harley-Davidson's quality standards. Whether Harley-Davidson manufactures the products itself or contracts with others to do so, Harley-Davidson has ensured that products bearing the HARLEY-DAVIDSON Trademarks are manufactured to the highest quality standards.

15.     The HARLEY-DAVIDSON Trademarks are famous marks, as that term is used in 15 U.S.C. § 1125(c)(1), and have been continuously used and never abandoned. The innovative marketing and product designs of the Harley-Davidson Products have enabled the Harley-Davidson brand to achieve widespread recognition and fame and have made the HARLEY-DAVIDSON Trademarks some of the most well-known marks in the world. The widespread fame, outstanding reputation, and significant goodwill associated with the Harley-Davidson brand have made the HARLEY-DAVIDSON Trademarks valuable assets of Harley-Davidson.

16.     Genuine Harley-Davidson Products are sold only through authorized retail channels and are recognized by the public as being exclusively associated with the Harley-Davidson brand.

17.     Harley-Davidson has numerous licensees in the United States that are authorized to sell a wide range of Harley-Davidson Products. These licensees have offered a wide variety of products under the HARLEY-DAVIDSON Trademarks for decades.

18.     Harley-Davidson has standards and guidelines to which all authorized licensed products branded with the HARLEY-DAVIDSON Trademarks must adhere. These standards and guidelines allow Harley-Davidson to control the quality and appearance, among other things, of licensed Harley-Davidson Products. Moreover, all licensed Harley-Davidson Products are subject to Harley-Davidson's prior written approval before they are manufactured, promoted, and sold to the public.

19.     Harley-Davidson Products have become enormously popular and even iconic, driven by the brand's arduous quality standards and innovative design. Among the purchasing public, genuine Harley-Davidson Products are instantly recognizable as such. In the United States and around the world, the Harley-Davidson brand has come to symbolize high quality and Harley-Davidson Products are among the most recognizable in the world. Harley-Davidson Products are distributed and sold to consumers through a network of nearly 700 authorized dealers located throughout the country and numerous other retail outlets.

20.     Genuine Harley-Davidson Products have also been promoted and sold at the official Harley-Davidson.com website and through authorized dealers' websites for many years. Sales of Harley-Davidson Products via the Harley-Davidson.com website are significant. The Harley-Davidson.com website features proprietary content, images, and designs exclusive to the Harley-Davidson brand.

21.     Harley-Davidson Products and the HARLEY-DAVIDSON Trademarks have received significant unsolicited media coverage for many years, including, for example, in national publications such as *Business Week, The Chicago Tribune, The New York Times, The Wall Street Journal, The Washington Post,* and *USA Today,* as well as in numerous national

television programs and online publications and websites, such as MSNBC, CNN Money, cnn.com, and Yahoo! Finance.

22.     Harley-Davidson, its dealers, and licensees have sold many billions of dollars of products and services under the HARLEY-DAVIDSON Trademarks over the years, and have expended millions of dollars advertising and promoting those marks through virtually every media. For example, Harley-Davidson has promoted its products and marks through dealer promotions, customer events, direct mailings, national television, print, radio advertisements, and the Internet. As a result, products bearing the HARLEY-DAVIDSON Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being high-quality products sourced from Harley-Davidson. Harley-Davidson Products have become among the most popular of their kind in the U.S. and the world. The HARLEY-DAVIDSON Trademarks have achieved tremendous fame and recognition which has only added to the inherent distinctiveness of the marks.

23.     As a result of Harley-Davidson's significant promotional efforts, commercial success, and popularity, the Harley-Davidson brand has been ranked annually for the past decade among the top 100 most valuable brands in the world by Interbrand, a leading independent branding firm. In 2015, Interbrand estimated the value of the Harley-Davidson brand at US $5.46 billion. The goodwill associated with the Harley-Davidson brand and the HARLEY-DAVIDSON Trademarks is of incalculable and inestimable value to Harley-Davidson.

**The Defendants**

24.     Defendants are individuals and business entities of unknown makeup who own and/or operate one or more of the e-commerce stores under at least the Seller Aliases identified on Schedule A and/or other seller aliases not yet known to Harley-Davidson. Upon information

and belief, Defendants reside and/or operate in the People's Republic of China or other foreign jurisdictions with lax trademark enforcement systems, or redistribute products from the same or similar sources in those locations. Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b).

25.     On information and belief, Defendants, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed in Schedule A attached hereto. Tactics used by Defendants to conceal their identities and the full scope of their operation make it virtually impossible for Harley-Davidson to discover Defendants' true identities and the exact interworking of their counterfeit network. If Defendants provide additional credible information regarding their identities, Harley-Davidson will take appropriate steps to amend the Complaint.

### IV. DEFENDANTS' UNLAWFUL CONDUCT

26.     The success of the Harley-Davidson brand has resulted in significant counterfeiting of the HARLEY-DAVIDSON Trademarks. Consequently, Harley-Davidson has a worldwide anti-counterfeiting program and regularly investigates suspicious e-commerce stores identified in proactive Internet sweeps and reported by consumers. In recent years, Harley-Davidson has identified many fully interactive, e-commerce stores offering counterfeit Harley-Davidson Products on online marketplace platforms such as Amazon, eBay, AliExpress, Alibaba, Wish.com, Walmart, Etsy, Temu, and DHgate, including the e-commerce stores operating under the Seller Aliases. The Seller Aliases target consumers in this Judicial District and throughout the United States. According to a U.S. Customs and Border Protection ("CBP"), report, in 2021, CBP made over 27,000 seizures of goods with intellectual property rights ("IPR") violations totaling over $3.3 billion, an increase of $2.0 billion from 2020. *Intellectual Property Rights Seizure Statistics, Fiscal Year 2021*, U.S. Customs and Border Protection

(**Exhibit 2**). Of the 27,000 in total IPR seizures, over 24,000 came through international mail and express courier services (as opposed to containers), most of which originated from China and Hong Kong. *Id.*

27.     Third party service providers like those used by Defendants do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these e-commerce platforms." **Exhibit 3**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. INT'L L. & BUS. 157, 186 (2020); *see also*, report on "Combating Trafficking in Counterfeit and Pirated Goods" prepared by the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans (Jan. 24, 2020) attached as **Exhibit 4** and finding that on "at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling" and recommending that "[s]ignificantly enhanced vetting of third-party sellers" is necessary. Counterfeiters hedge against the risk of being caught and having their websites taken down from an e-commerce platform by preemptively establishing multiple virtual storefronts. **Exhibit 4** at p. 22. Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, counterfeiters can have many different profiles that can appear unrelated even though they are commonly owned and operated. **Exhibit 4** at p. 39. Further, "E-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters." **Exhibit 3** at 186–87.

28.     Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and/or funds

from U.S. bank accounts, and, on information and belief, have sold Counterfeit Harley-Davidson Products to residents of Illinois.

29.     Defendants concurrently employ and benefit from substantially similar advertising and marketing strategies. For example, Defendants facilitate sales by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers. E-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars and/or funds from U.S. bank accounts via credit cards, Alipay, Amazon Pay, and/or PayPal. E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish such stores from an authorized retailer. Harley-Davidson has not licensed or authorized Defendants to use any of the HARLEY-DAVIDSON Trademarks and none of the Defendants are authorized retailers of genuine Harley-Davidson Products.

30.     Many Defendants also deceive unknowing consumers by using the HARLEY-DAVIDSON Trademarks without authorization within the content, text, and/or meta tags of their e-commerce stores to attract various search engines crawling the Internet looking for e-commerce stores relevant to consumer searches for Harley-Davidson Products. Other e-commerce stores operating under the Seller Aliases omit using HARLEY-DAVIDSON Trademarks in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Harley-Davidson Products.

31.     E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading, and/or incomplete

information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

32. E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Counterfeit Harley-Davidson Products. Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities and the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

33. Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Seller Aliases often share unique identifiers such as templates with common design elements that intentionally omit any contact information or other information for identifying Defendants or other seller aliases they operate or use. E-commerce stores operating under the Seller Aliases include other notable common features such as use of the same registration patterns, accepted payment methods, check-out methods, keywords, advertising tactics, similarities in price and quantities, the same incorrect grammar and misspellings, and/or the use of the same text and images. Additionally, Counterfeit Harley-Davidson Products for sale by the Seller Aliases bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit Harley-Davidson Products were manufactured by and come from a common source and that Defendants are interrelated.

34. E-commerce store operators like Defendants are in constant communication with each other and regularly participate in QQ.com chat rooms and through websites such as sellerdefense.cn and kuajingvs.com regarding tactics for operating multiple accounts, evading detection, pending litigation, and potential new lawsuits.

35.     Counterfeiters such as Defendants typically operate under multiple seller aliases and payment accounts so that they can continue operation in spite of Harley-Davidson's enforcement. E-commerce store operators like Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to off-shore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to Harley-Davidson. Indeed, analysis of financial account transaction logs from previous similar cases indicates that off-shore counterfeiters regularly move funds from U.S.-based financial accounts to off-shore accounts outside the jurisdiction of this Court.

36.     Defendants are working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Counterfeit Harley-Davidson Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from Harley-Davidson, have jointly and severally, knowingly and willfully used and continue to use the HARLEY-DAVIDSON Trademarks in connection with the advertisement, distribution, offering for sale, and sale of Counterfeit Harley-Davidson Products into the United States and Illinois over the Internet.

37.     Defendants' unauthorized use of the HARLEY-DAVIDSON Trademarks in connection with the advertising, distribution, offering for sale, and sale of Counterfeit Harley-Davidson Products, including the sale of Counterfeit Harley-Davidson Products into the United States, including Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Harley-Davidson.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

38.     Harley-Davidson hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

39. This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the federally registered HARLEY-DAVIDSON Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. The HARLEY-DAVIDSON Trademarks are highly distinctive marks. Consumers have come to expect the highest quality from Harley-Davidson Products offered, sold, or marketed under the HARLEY-DAVIDSON Trademarks.

40. Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of the HARLEY-DAVIDSON Trademarks without Harley-Davidson's permission.

41. Harley-Davidson is the exclusive owner of the HARLEY-DAVIDSON Trademarks. Harley-Davidson's United States Registrations for the HARLEY-DAVIDSON Trademarks (**Exhibit 1**) are in full force and effect. On information and belief, Defendants have knowledge of Harley-Davidson's rights in the HARLEY-DAVIDSON Trademarks and are willfully infringing and intentionally using counterfeits of the HARLEY-DAVIDSON Trademarks. Defendants' willful, intentional, and unauthorized use of the HARLEY-DAVIDSON Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the Counterfeit Harley-Davidson Products among the general public.

42. Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

43. Harley-Davidson has no adequate remedy at law and, if Defendants' actions are not enjoined, Harley-Davidson will continue to suffer irreparable harm to its reputation and the goodwill of the HARLEY-DAVIDSON Trademarks.

44. The injuries and damages sustained by Harley-Davidson have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of Counterfeit Harley-Davidson Products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

45. Harley-Davidson hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

46. Defendants' promotion, marketing, offering for sale, and sale of Counterfeit Harley-Davidson Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Harley-Davidson or the origin, sponsorship, or approval of Defendants' Counterfeit Harley-Davidson Products by Harley-Davidson.

47. By using the HARLEY-DAVIDSON Trademarks in connection with the sale of Counterfeit Harley-Davidson Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Counterfeit Harley-Davidson Products.

48. Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Counterfeit Harley-Davidson Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

49. Harley-Davidson has no adequate remedy at law and, if Defendants' actions are not enjoined, Harley-Davidson will continue to suffer irreparable harm to its reputation and the goodwill of the HARLEY-DAVIDSON Trademarks.

**PRAYER FOR RELIEF**

WHEREFORE, Harley-Davidson prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

   a. using the HARLEY-DAVIDSON Trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine Harley-Davidson Product or is not authorized by Harley-Davidson to be sold in connection with the HARLEY-DAVIDSON Trademarks;

   b. passing off, inducing, or enabling others to sell or pass off any product as a genuine Harley-Davidson Product or any other product produced by Harley-Davidson, that is not Harley-Davidson's or not produced under the authorization, control, or supervision of Harley-Davidson and approved by Harley-Davidson for sale under the HARLEY-DAVIDSON Trademarks;

   c. committing any acts calculated to cause consumers to believe that Defendants' Counterfeit Harley-Davidson Products are those sold under the authorization, control, or supervision of Harley-Davidson, or are sponsored by, approved by, or otherwise connected with Harley-Davidson;

   d. further infringing the HARLEY-DAVIDSON Trademarks and damaging Harley-Davidson's goodwill; and

   e. manufacturing, shipping, delivering, holding for sale, transferring, or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner,

products or inventory not manufactured by or for Harley-Davidson, nor authorized by Harley-Davidson to be sold or offered for sale, and which bear any of Harley-Davidson's trademarks, including the HARLEY-DAVIDSON Trademarks, or any reproductions, counterfeit copies or colorable imitations thereof;

2) Entry of an Order that, upon Harley-Davidson's request, those with notice of the injunction including, without limitation, any online marketplace platforms such as eBay, AliExpress, Alibaba, Amazon, Wish.com, Walmart, Etsy, DHgate, and Temu (collectively, the "Third Party Providers") shall disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the HARLEY-DAVIDSON Trademarks;

3) That Defendants account for and pay to Harley-Davidson all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the HARLEY-DAVIDSON Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

4) In the alternative, that Harley-Davidson be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the HARLEY-DAVIDSON Trademarks;

5) That Harley-Davidson be awarded its reasonable attorneys' fees and costs; and

6) Award any and all other relief that this Court deems just and proper.

Dated this 30th day of July 2024.        Respectfully submitted,

<u>/s/ Justin R. Gaudio</u>
Amy C. Ziegler
Justin R. Gaudio
Marcella D. Slay
Trevor C. Talhami
Greer, Burns & Crain, Ltd.
300 South Wacker Drive, Suite 2500
Chicago, Illinois 60606
312.360.0080 / 312.360.9315 (facsimile)
aziegler@gbc.law
jgaudio@gbc.law
mslay@gbc.law
ttalhami@gbc.law

*Counsel for Plaintiff*
*Harley-Davidson Motor Company, Inc.*